## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,   )
   )
   v.   )   No. 2:20-cr-112-NR
   )
RICHARD WATSON,   )
   )
   Defendant.   )
   )

### MEMORANDUM OPINION

Defendant Richard Watson moves the Court to suppress evidence obtained during the execution of a search warrant at Omerta Ink, a tattoo parlor that he owned. [ECF 31]. Separately, Mr. Watson also moves to compel the government to produce certain categories of discovery. [ECF 31-1]. For the following reasons, the Court denies both motions.

### BACKGROUND

On June 3, 2020, a grand jury returned a one-count indictment against Mr. Watson, charging him with unlawfully possessing ten "silencers" in violation of 26 U.S.C. § 5861(d). [ECF 2]. The charge resulted from an August 15, 2019, search of Omerta Ink—a tattoo parlor owned by Mr. Watson—and a nearby, detached garage. The search was conducted by agents affiliated with the Bureau of Alcohol, Tobacco, Firearms, and Explosives acting under a federal search warrant signed the day before by United States Magistrate Judge Lisa Pupo Lenihan. [ECF 31, p. 18]. In addition to the ten silencers that form the basis for the indictment, agents found five handguns, seven long-guns, ammunition, machining tools, and various "components" that are allegedly used to manufacture firearms. [*Id.* at pp. 19-20, 26-31].

Before seeking the search warrant in question, the ATF had conducted an investigation that led them to suspect that Mr. Watson was engaging in

unlawful arms-dealing out of Omerta Ink.   The specific details of that investigation were set forth in the affidavit, accompanying the warrant application, and are as follows.

Initially, agents arranged a meeting between Mr. Watson and a confidential informant, who agreed to wear a recording device. [ECF 33-2, ¶¶ 4-5]. During the meeting, Mr. Watson was recorded agreeing to sell a gun to the informant and telling him "everyone in the hood knows that I'm the gun guy." [*Id*. at ¶ 5]. Subsequently, agents used the informant to conduct two controlled purchases of guns from Mr. Watson at Omerta Ink. [*Id*. at ¶¶ 6-10]. The first transaction was conducted in or around mid- or late- July 2019, while the second occurred in early-August 2019. [*Id*. at ¶¶ 4, 9]. Both times, agents surveilled the premises from outside Omerta Ink as the informant entered with traceable money provided by ATF and emerged soon after with a seemingly homemade firearm. [*Id*. at ¶¶ 7-8]. After the first of these transactions, the agents observed Mr. Watson immediately exit Omerta Ink and enter a nearby, detached garage for several minutes. [*Id*. at ¶ 7]. During the second transaction, Mr. Watson allegedly told the informant that he could provide more guns and would offer a discount if they were bought in bulk. [*Id*. at ¶ 9].

In addition to their observations during the controlled purchases, agents reviewed public records reflecting that Mr. Watson owned both Omerta Ink and the detached garage. [*Id*. at ¶ 3]. They also examined the guns purchased during the operations, noting that they appeared to incorporate "AR-type receiver-blanks" that had been fitted using various machining tools. [*Id*. at ¶ 10 (cleaned up)]. Based on his specialized training, knowledge, and experience, the affiant-agent (ATF Special Agent Ryan Rennig) stated that conversion of the AR-type receivers into completed guns would require tools such as a drill press or milling machine, technical knowledge of tool operation and firearm

specifications, and a location suitable to complete the work.  [*Id.* at ¶ 13].  Mr. Watson does not hold any federal firearms license and is not lawfully permitted to engage in the business of manufacturing and selling firearms. [*Id.* at ¶ 14].

Based on the foregoing information, Magistrate Judge Lenihan issued a search warrant.  The search warrant issued by Judge Lenihan authorized a search of "[a]ll rooms, areas[,] and locations within the structure associated with OMERTA INK, to include the detached garage which exists to the rear (south) and can be accessed via Craig Street." [ECF 31, p. 21].  The warrant further authorized the seizure of eight categories of evidence, including, specifically, "[a]ny firearm(s) present that constitute an ongoing violation of 18 U.S.C. § 922(a)(1)." [*Id.* at p. 25].[1]

Mr. Watson now seeks to suppress all evidence uncovered during the search of Omerta Ink, arguing that the search warrant was improvidently issued without probable cause and suffers from various other facial defects. The government opposes suppression.  Mr. Watson also seeks the discovery of a number of pieces of information.  The government also opposes this motion— partially on the merits and partially as being premature.   No party has requested an evidentiary hearing on these motions, and the Court finds that one is not required.  The motions are therefore fully briefed and ready for disposition.

---

[1]  18 U.S.C. § 921(a)(3) defines the term "firearm" for purposes of Title 18, Part I, Chapter 44 of the United States Code to include "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C).  Likewise, 26 U.S.C. § 5845(a) defines the term "firearm" for purposes of Title 26, Subtitle E, Chapter 53 (the chapter under which Mr. Watson was ultimately charged) to include "any silencer (as defined in Section 921 of title 18, United States Code)." 26 U.S.C. § 5845(a)(7).  Thus, for all relevant purposes, a "silencer" is a "firearm" within the meaning of the United States Code.

## DISCUSSION & ANALYSIS

### I.   The Court denies Mr. Watson's motion to suppress evidence.

1.   **Probable cause.**  Mr. Watson's first two arguments challenge the Magistrate Judge's determination that the government had shown the "probable cause" necessary to obtain a search warrant for Mr. Watson's tattoo parlor.  His first argument is that the search warrant lacked probable cause because the warrant application failed to set forth a factual basis for the Magistrate Judge to assess the reliability and veracity of the government's confidential informant.  His second argument is that the warrant application did not establish probable cause for the specified crime under investigation— a violation of 18 U.S.C. § 922(a)(1)(A)—because the affiant provided no factual basis for the Magistrate Judge to infer that Mr. Watson was a "dealer" who was "engaged in the business of selling firearms at wholesale or retail."  18 U.S.C. § 921(a)(11)(A), (a)(21)(A)-(D).

To establish "probable cause," the government must present evidence that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This standard is "flexible" and calls for a "practical, common-sense decision" based on the "totality-of-the-circumstances."  *Id.* at 238-39; *see Fla. v. Harris*, 568 U.S. 237, 244 (2013) ("All we have required is the kind of 'fair probability' on which reasonable and prudent people, not legal technicians, act . . . We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach.") (cleaned up).

When reviewing a search warrant in the context of a subsequent motion to suppress evidence, "the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided."

*United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005) (citing *Gates*, 462 U.S. at 236).  This Court's role "is not to decide probable cause *de novo*, but to determine whether the magistrate had a substantial basis for concluding that probable cause existed."  *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 238).

Here, the Court finds that the Magistrate Judge had a "substantial basis" for concluding that evidence of illegal arms-dealing activity would likely be found at Omerta Ink.  According to the warrant application, Mr. Watson was audio recorded agreeing to sell a gun to the informant and stating that "everyone in the hood" knew he was "the gun guy."  [ECF 33-2, ¶ 5].  The investigating agents then used the informant to arrange and carry out two controlled purchases of seemingly home-brewed guns from Mr. Watson at Omerta Ink.  [*Id.* at ¶¶ 6-10].  After the first of these transactions, the agents observed Mr. Watson immediately exit Omerta Ink and enter a nearby, detached garage for several minutes.  [*Id.* at ¶ 7].  During the second transaction, Mr. Watson allegedly told the informant that he could provide more guns, and would offer a discount if they were bought in bulk.  [*Id.* at ¶ 9].[2]  Finally, public records reviewed by the government's agents reflected that Mr. Watson owned both Omerta Ink and the detached garage.  [*Id.* at ¶ 3].

To be sure, the affidavit does not provide the basis for the informant's veracity or reliability. But it didn't have to.  That is, with the possible exception of Mr. Watson's alleged statements about selling guns in bulk (assuming they were not also audio recorded), [*Id.* at ¶ 9], none of this information depended on the informant's veracity or reliability. Certainly, the audio recordings of Mr. Watson's initial meeting with the informant speak for themselves.  And while

---

[2] It is unclear from the warrant application if these statements were also audio recorded.  For purposes of this decision, the Court assumes they were not.

the agents did not directly observe Mr. Watson hand a gun to the informant, they closely controlled the circumstances of the two purchases (*e.g.,* by providing traceable money, searching the informant's car for contraband before allowing him to enter the tattoo parlor, and surveilling the premises during the sale). Both times, the informant entered Omerta Ink with money provided by the agents and emerged soon after with a gun.

These circumstances were enough for the Magistrate Judge to infer that there was a "fair probability" that evidence of the criminal activity under investigation would be found at Omerta Ink, regardless of the informant's credibility. Collectively, (1) Mr. Watson's incriminating "gun guy" statement; (2) his ownership of the tattoo parlor and adjacent garage; (3) the controlled purchase of two guns from Omerta Ink under close surveillance by government agents; and (4) the customized nature of the guns bought by the informant supported a fair inference that Mr. Watson was engaged in the regular business of dealing guns for money at Omerta Ink. *See United States v. Rauser*, 378 F. App'x 229, 234 (3d Cir. 2010) ("Controlled buys have been sufficient to establish probable cause.") (citation omitted); *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity."); *United States v. Wellbeloved-Stone*, No. 17-14, 2018 WL 1973286, at *9 (W.D. Va. Apr. 26, 2018) ("When seeking to establish probable cause to support a warrant, the Government is not required to disbelieve an investigative target's own statements about his own previous criminal acts[.]"); *Pechulis v. City of Chicago*, No. 96-2853, 1998 WL 559770, at *2 (N.D. Ill. Aug. 28, 1998) ("In that case, none of the information relied upon to establish probable cause came

directly from the suspect. Here, as noted above, John Jr.'s own statements implicated him as the individual involved.").[3]

    **2.**    **Entrapment.**  Mr. Watson argues that the search warrant also "failed to show that he committed a crime" because he was "entrapped." More precisely, he speculates that the informant *could have* "pressured" him to sell the guns, without citing any information in the warrant application (or elsewhere) that suggests such pressure actually occurred. *See* [ECF 31, p. 10 ("For instance, the informant could have had embarrassing or incriminating evidence over Defendant or one of Defendant's family members or friends, or could have been owed money by Defendant, or could have had other means of improperly pressuring Defendant to provide the gun.")].

    This speculation does not undermine the Magistrate Judge's basis for finding probable cause. To begin with, "[t]he possibility of an entrapment defense is not material to whether a search warrant should be issued which is otherwise sufficient on its face." *United States v. Call*, No. 209-79, 2010 WL 932599, at *2 (D. Nev. Mar. 11, 2010); *see also United States v. Christie,* 570 F. Supp. 2d 657, 672 (D.N.J. 2008) ("While any improper activity by the FBI might be the basis for an entrapment defense, that potential affirmative defense does not change the fact that Christie made such postings from his computer in New

---

[3] Even if the informant had been the exclusive source for any piece of information in the warrant application, such information was sufficiently corroborated, for purposes of establishing probable cause, by all the other evidence discussed that did not depend on the informant's veracity or reliability, such as the audio recordings of Mr. Watson's own incriminating statements. *See United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) ("An informant may also be considered reliable if the information he or she supplies is at least partially corroborated by other sources . . . Even the corroboration of minor, innocent details can suffice to establish probable cause.") (cleaned up).

Jersey, which is sufficient on its face for a finding of probable cause to issue a warrant."); *United States v. McCollum*, No. 05-256, 2005 WL 3159662, at *6 (D. Neb. Nov. 28, 2005) ("Whatever merit the entrapment defense may have at trial, it was not material to the question of whether a search warrant should be issued.").

But even if that were not so, Mr. Watson has not been charged with any crime related to his selling guns to the confidential informant.  Instead, he is charged with unlawfully possessing ten silencers that were recovered during the later search of Omerta Ink.  [ECF 2].  These silencers were not part of the informant's controlled buys.  As a result, any sort of entrapment during the informant's controlled buys is inapposite to the crime for which Mr. Watson has been charged.

**3.    Staleness.**  Mr. Watson argues that the facts relayed in the warrant application were "stale" because "the alleged undercover buy occurred in mid-July of 2019 … [a]nd yet the warrant was not signed until August 14, 2019, oddly at 5:30 p.m[.]" [ECF 31, p. 11 (cleaned up)].  The Court does not find this delay to be legally significant.  As the government points out, the second controlled purchase occurred in early August 2019—no more than a few weeks before the warrant was sought.  *See* [ECF 33-2, ¶ 9 ("During the second transaction, which occurred in early August…")].  Thus, the government executed the search warrant reasonably soon after the second transaction occurred.

In any event, Mr. Watson cites no authority suggesting that a delay of a few weeks is, in itself, especially suggestive of staleness in any similar context. *See United States v. Harvey,* 2 F.3d 1318, 1322 (3d Cir. 1993) ("Age alone, however, does not determine staleness."); *cf. United States v. Christie*, 570 F. Supp. 2d 657, 681 (D.N.J. 2008) ("The warrant issued based upon the

attestation that someone at Mr. Christie's home advertised child pornography a mere month prior to the warrant's issuance. That is plainly sufficient to withstand any staleness challenge.") (citations omitted).  Moreover, because the government was trying to establish probable cause to suspect Mr. Watson of conducting regular arms deals out of Omerta Ink, it was reasonable, and perhaps necessary, for agents to wait to complete a second controlled purchase before seeking a search warrant.  Finally, the stationary and continuous nature of the criminal business under investigation also made any passage of time less significant.  *See United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983) ("When an activity is of a protracted and continuous nature, the passage of time becomes less significant.") (cleaned up).

As a result, the Magistrate Judge had a substantial basis for concluding that the information in the warrant application was not stale.

**4.    Particularity.**  Mr. Watson next argues that the search warrant issued by the Magistrate Judge was unconstitutionally overbroad, or insufficiently "particularized."  The Court disagrees.

The Fourth Amendment prohibits "general warrants" that would allow "exploratory rummaging in a person's belongings." *United States v. Perez*, 712 F. App'x 136, 138 (3d Cir. 2017) (cleaned up).  To guard against such warrants, courts require "particularity," which "prevents the seizure of one thing under a warrant describing another."  *Id.* (cleaned up).  To satisfy this standard, a warrant must (1) identify the specific offense for which the government has established probable cause; (2) describe the place to be searched; and (3) specify the items to be seized by their relation to designated crimes.  The intent of these requirements is to ensure that "nothing is left to the discretion of the officer executing the warrant."  *Id.* (citation omitted).  That said, "[t]he [particularity] standard … is one of practical accuracy rather than technical

nicety." *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975) (cleaned up). Particularity, not perfection, is what's required. *Cf. United States v. Christine*, 687 F.2d 749, 760 (3d Cir. 1982) ("[N]o tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision.").

Mr. Watson argues that the warrant here was overbroad in two respects. First, he argues that the warrant was overbroad in that it allowed agents to search areas of the property that "other tenants and multiple people had full access" to. [ECF 31, pp. 13-15]. These areas are, apparently, (1) an unidentified "common access" to a neighboring store; and (2) the detached garage identified in the warrant, which Mr. Watson contends was a "separate entity and free-standing garage" called "Banks Automotive." [*Id.*].

This argument is unpersuasive. Mr. Watson does not dispute or refute that he owned and had unrestricted access to the garage and any of the (unidentified) common areas. He only suggests that others had access to those areas, too, and were perhaps co-tenants in some unspecified sense. But where probable cause exists to search a particular building (as it does here), "a warrant encompasses the authority to search the entire building if the person who is the target of the search has access to or control over the entire premises." *Torres v. United States*, 200 F.3d 179, 187 (3d Cir. 1999) (citations omitted); *United States v. Ross*, 456 U.S. 798, 820 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found."). This includes any areas that are "occupied in common." *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985) ("[A] warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect.")

- 10 -

(citations omitted); *United States v. Bedford*, 519 F.2d 650, 655 n.7 (3d Cir. 1975) ("[I]f the police were lawfully inside the apartment building, they could search and seize items specified in the warrant and found in common areas of the building."). As a result, given the nature of the probable cause that supported issuance of the search warrant, it was reasonable for the Magistrate Judge to authorize a search of the two buildings located on Mr. Watson's property in their entirety.

Second, Mr. Watson argues that one of the categories of "items to be seized" identified in the warrant was overbroad. Specifically, Mr. Watson challenges the warrant's authorization of the seizure of "[a]ny and all information revealing the identity of co-conspirators in firearm related activity." [ECF 31, p. 13]. He suggests that this "broad category could encompass almost any document with the name of another individual, or a photograph, invoice, slip of paper, or contacts in a phone." [*Id*.]. He worries that this would have, in theory, allowed "agents to root around in [his] phone and computer and other electronic devices looking for names or pictures or references to friends and acquaintances." [*Id*.]. And he suggests that this alleged overbreadth renders the warrant invalid. [*Id*.].

Not so. Initially, the Court agrees with the government that this language is not reasonably interpreted to allow for seizure of "any document with the name of another individual," as Mr. Watson fears. Instead, the warrant, by its plain terms, only allowed the police to seize items that were suggestive of other individuals' *involvement as co-conspirators* in the illegal arms-dealing business being investigated. Any items that merely reflected the identity of someone Mr. Watson knew, without a nexus tying those individuals to the crime under investigation, could not be lawfully seized.

Likewise, the Court does not share Mr. Watson's concern that a reasonable police officer could interpret this warrant to authorize a broad search of the contents of any phone or electronic device located in the buildings to be searched.  Instead, to authorize such a search, the warrant would need to identify the electronic devices in question as places to be searched, which the warrant here does not do.  *See Riley v. California,* 573 U.S. 373, 401 (2014) ("[A] warrant is generally required before [searching the contents of a cell phone], even when a cell phone is seized incident to arrest."); *Patterson v. Burton* No. 16-654, 2020 WL 6800425, at *8 (E.D. Cal. Nov. 19, 2020) ("Generally, law enforcement officials must obtain a warrant before searching the contents of a phone.") (citations omitted); *see, e.g., United States v. Westley*, No. 17-171, 2018 WL 3233134, at *12 (D. Conn. July 2, 2018) ("Finally, the warrant also authorized only the seizure of any cell phones found, not a search of their content. A separate warrant was applied for and obtained to search for content on the devices themselves, and Mr. Pervis does not challenge the issuance of that warrant by itself."); *United States v. Ramirez*, No. 12-10089, 2013 WL 11324210, at *1 (D. Kan. Apr. 30, 2013) ("There is nothing in the record to explain why the affidavit and warrant do not mention 'cell phone' and the court adheres to his conclusion that, as a matter of law, the first warrant did not authorize the officer to search the contents of the cell phone.").

Finally, even if this one category of items to be seized was potentially overbroad, that would not require invalidation of the rest of the warrant or suppression of all evidence obtained from the search.  Instead, "only that evidence seized without valid authorization supported by particularized probable cause is suppressed."  *Christine*, 687 F.2d at 758; *see also United States v. Cobb,* 970 F.3d 319, 331 (4th Cir. 2020) ("In such cases, the evidence obtained pursuant to the lawful portion of the warrant is rightly admitted and

the remainder of the warrant, while too broad, provides no basis for reversal.")
(cleaned up).  Here, the evidence Mr. Watson seeks to suppress (*e.g.*, silencers,
handguns, ammunition, machining tools, and various components that can be
used to manufacture firearms) does not even arguably fall within the allegedly
overbroad category of "information revealing the identity of co-conspirators in
firearm related activity."  Suppression is therefore not required.

    For all these reasons, the Court rejects Mr. Watson's argument that the
warrant was not sufficiently particularized in any relevant respect.

    **5.**    **Minimization.**  Mr. Watson argues that the warrant "did not
include adequate minimization procedures" to avoid privacy concerns
associated with surveillance of a tattoo parlor.  [ECF 31, pp. 15-17].  For
example, Mr. Watson contends that the informant conducted "surreptitious
audio surveillance" that captured "a female client getting body piercings by a
female artist and discussing future tattoo work to herself with [Mr. Watson]."
[*Id.* at p. 15].  He argues that the lack of "any specific written parameters to
minimize the recording of innocent tattoo seekers" requires suppression of all
evidence obtained during the eventual search.  [*Id.* at p. 16-17].

    This argument is ill-fitting. The audio surveillance here was not
conducted pursuant to the challenged search warrant or, for that matter, any
warrant at all.  Instead, it was conducted with the consent of the confidential
informant, who agreed to wear a wire.  No warrant was required to make those
recordings because Mr. Watson had "no legitimate expectation of privacy in
conversations with a person who consents to the recording of the
conversations." *United States v. Lee*, 359 F.3d 194, 201 (3d Cir. 2004).  Thus,
it is unclear how "the warrant" could have (retroactively) imposed any "written
parameters" on these recordings at all.

Mr. Watson cites no authority requiring the suppression of otherwise lawful audio recordings (let alone other evidence obtained under a later-issued search warrant) simply because they inadvertently record third parties having audible conversations in the background.  Instead, Mr. Watson relies primarily on a Florida state-court decision involving the owner of the New England Patriots and video surveillance of suspected prostitution activity at a massage parlor—surveillance that was obviously far more intrusive and conducted *pursuant to overbroad search warrants*.  *See, e.g.,* [ECF 31, pp. 47-48 ("The warrants at issue did not set forth any specific written parameters to minimize the recording of innocent massage seekers, and law enforcement did not actually employ sufficient minimization techniques when monitoring the video or deciding what to record.")].  The other case law Mr. Watson cites also discusses minimization requirements for *warrants* authorizing video or audio surveillance.  *See, e.g., United States v. Mesa-Rincon*, 911 F.2d 1433, 1436 (10th Cir. 1990) (discussing minimization requirements for "warrants for video surveillance.").

In short, because there was no warrant related to the audio surveillance here, and because no warrant was required, there is nothing for this Court to analyze for the presence of adequate minimization procedures and thus no evidence to suppress.

**6.    Good Faith Exception.**    Finally, Mr. Watson makes no argument, and thus does not establish, that either the affiant or the other agents involved in executing the search warrant acted in any form of bad faith. Where "an officer obtains a warrant and executes it in good faith, there is no police illegality and thus nothing to deter" by applying the exclusionary rule. *Stearn*, 596 F.3d at 560-61 (cleaned up).  In most cases, courts will "not suppress evidence seized under a warrant's authority, even if that warrant is

subsequently invalidated, unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* (cleaned up). Thus, even if the warrant was illegal in some marginal respect, the Court would decline to suppress the evidence obtained here based on the "good faith" exception.

For all these reasons, Mr. Watson's motion to suppress is denied in its entirety.

## II. The Court denies Mr. Watson's motion for discovery.

Mr. Watson has also separately filed a "motion for discovery," which seeks a list of discovery information from the government. The Court addresses those requests as follows:

**1.    Identity of confidential informant.**  Mr. Watson seeks to compel the government to identify its confidential informant and provide a host of other information bearing on the informant's credibility. [ECF 31-1, pp. 1-2]. The government asserts that it is withholding this information based on its limited "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *United States v. Rivera*, 524 F. App'x 821, 826 (3d Cir. 2013) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). To overcome that privilege, Mr. Watson must show either (1) that the informant's possible testimony is highly relevant; (2)   that the informant's testimony might disclose an entrapment; (3) that the informant's testimony might cast doubt on the defendant's identity; or (4) that the informant was the sole participant, other than the accused, in the transaction charged. *United States v. Jiles*, 658 F.2d 194, 198-99 (3d Cir. 1981) (citation omitted). However, "[w]here an informant's role was [only] in validating a search, disclosure of his identity is not required."

*United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (*en banc*) (citation omitted).

At this juncture, Mr. Watson has not shown any specific need for the informant's identity that is sufficient to overcome this privilege. As discussed, Mr. Watson is not charged with any crime associated with his gun sales to the informant. Rather, he is charged with possessing ten silencers found during a subsequent search of his tattoo parlor by police. [ECF 2]. At least for now, then, it appears that the informant's role, if any, was limited to validating the search in question. That does not provide a basis for disclosure of his identity. *Bazzano*, 712 F.2d at 839. Moreover, application of that rule makes sense here, since, as discussed, the search warrant in question was not procured based on any representation about the informant's reliability or credibility that might need to be tested.

Thus, to the extent Mr. Watson seeks immediate disclosure of the informant's identity or other information, his motion is denied. However, this denial is without prejudice. If, as trial approaches, it becomes clear that the informant's identity will bear significantly on a defense Mr. Watson intends to assert, that the government intends to rely on the informant's testimony to prove any aspect of its case, or that the informant's identity is otherwise "highly relevant," the Court would entertain a renewed motion for disclosure of this information.

**2.      Information regarding government witnesses.**  Mr. Watson repeats his request for information about the confidential informant, and then requests a broad array of information about all the witnesses the government intends to call at trial. [ECF 31-1, pp. 2-3]. For the reasons stated above, the Court again denies the request for information related to the confidential informant without prejudice. Mr. Watson's remaining requests are largely

premature, but also too broad and vague for the Court to evaluate with any precision.  Moreover, Mr. Watson fails to cite any relevant legal authority compelling the immediate disclosure of any of the broad categories of witness information he identifies.

The Court thus denies the request without prejudice.  Mr. Watson should confer with the government to determine if there is any specific witness information to which he is entitled and that he has not received.  To the extent there are any disputes about such information, Mr. Watson may then raise those specific issues in another motion, identifying the information that has not been produced and citing legal authority to support his position that it should be immediately disclosed.  At this time, however, his request remains premature and unsupported.

**3.    Trial witness names and statements.**  Mr. Watson seeks to compel the government to identify all witnesses it intends to call at trial, "together with their statements as defined by Rule 26.2 [of the] Federal Rules of Criminal Procedure and 18 U.S.C. § 3500." [ECF 31-1, pp. 3-4].  Mr. Watson again fails to cite any legal authority compelling the immediate disclosure of any of the witness information he seeks.  To the contrary, 18 U.S.C. § 3500(a) specifically states that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."  As a result, Mr. Watson's request for this information is denied without prejudice at this time.  Mr. Watson should confer with the government if he believes there is some category of witness information that the government is obligated to immediately produce but has not.  If there is, he

should then file an appropriate motion specifically identifying that information and citing any relevant legal authority to support his position.

    **4.**    **Promises to co-defendants, undicted co-conspirators, or other witnesses.**  Invoking *Giglio v. United* States, 405 U.S. 150 (1972), Mr. Watson seeks information about "any representations which have been made by the Government or which the Government will make at any future time" regarding promises to co-defendants, unindicted co-conspirators, or other witnesses.  [ECF 31-1, p. 4].  The government responds that it is aware of its obligation to provide *Giglio* information, and that it will do so as required by the Court's pretrial order.  The Court's pretrial order will indeed set a date for the government to produce *Giglio* information, and so Mr. Watson's request is denied as premature at this time.  This denial is without prejudice to Mr. Watson's ability to file a motion to compel if the government fails to produce *Giglio* information by the deadline set in the Court's pretrial order.

    **5.**    **Rule 404(b) and Rule 801 evidence.**  Mr. Watson seeks disclosure of any Rule 404(b) or Rule 801(d)(2)(E) evidence that the government intends to produce at trial.  [ECF 31-1, pp. 4].  The government responds that it has not yet identified such evidence but commits that it will produce any such evidence at least three weeks before trial.  The Court's pretrial order will set an appropriate deadline for the government to produce any Rule 404 or Rule 801 evidence, and so Mr. Watson's request for this information is denied as premature at this time.  Again, this denial is without prejudice to Mr. Watson's ability to file a motion to compel in the event of any non-compliance with the Court's pretrial order.

    **6.**    **Law enforcement notes.**  Mr. Watson seeks to compel the government to preserve any "rough notes" taken by law enforcement agents, as required by *United States v. Ramos*, 27 F.3d 65 (3d Cir. 1994) and other

precedent in this Circuit.  *See United States v. Vella*, 562 F.2d 275 (3d Cir. 1977) (*per curiam*); *see also* [ECF 31-1, pp. 4-5].  What Mr. Watson requests is really just an order compelling the government to comply with the law, which it is already obligated to do.  The Court thus denies the request as unnecessary and premature.  There is no indication that the government is unaware of or has failed to comply with its obligations under *Ramos* or any other applicable law.  Of course, this denial is without prejudice for Mr. Watson to raise specific issues if any non-compliance later comes to light.

   **7.    Grand jury transcripts.**  Mr. Watson seeks to identify all individuals who testified before the grand jury and to compel production of the transcripts or recordings of all grand jury proceedings.  [ECF 31-1, pp. 5-6]. "As a matter of public policy, grand jury proceedings generally must remain secret except where there is a compelling necessity."  *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) (citations omitted).  A defendant may be entitled to review grand jury testimony after a witness "testifie[s] on direct examination at trial if their grand jury testimony was related to the subject matter of their trial testimony."  *United States v. Jackson*, 363 F. App'x 159, 161 (3d Cir. 2010) (citations omitted).  Otherwise, "[t]o support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy."  *United States v. Weingold*, 69 F. App'x 575, 578 (3d Cir. 2008) (quoting *McDowell*, 888 F.2d at 289).

   Here, no witness has "testified on direct examination," and Mr. Watson has not otherwise shown any "particularized need" for the secret grand jury information he seeks.   Instead, he merely speculates that something, somewhere in the grand jury transcripts might "provide exculpatory testimony that would be helpful to his defense," because the government's "case may

depend upon oral, unrecorded statements of Defendant or alleged co-conspirators," and thus "guilt or innocence may turn on exactly what was said." [ECF 31-1, pp. 6-7].  This generalized, speculative interest amounts to "a fishing expedition by the defendant" that does not justify premature disclosure of grand jury information.  *Weingold*, 69 F. App'x at 579.  Additionally, it is not at all clear that the government's case will, in fact, depend on "oral, unrecorded statements of Defendant or alleged co-conspirators" to any significant degree, if at all.  Mr. Watson's request for grand jury information is thus denied without prejudice to raise any related issues at an appropriate time (*i.e.,* after a witness testifies on direct examination or after a "particularized need" becomes apparent).

8.     **Rule 16 materials.**  Mr. Watson seeks to compel production of a wide range of materials purportedly covered by Federal Rule of Criminal Procedure 16.  [ECF 31-1, pp. 7-9].  The government responds that it is aware of its obligation to produce Rule 16 materials, has already produced many of the materials Mr. Watson requests, and will make all items seized during the search available for inspection at counsel's request.  Given the government's representations, Mr. Watson's request is denied as premature.  This denial is without prejudice. Mr. Watson should confer with the government to determine if any Rule 16 materials exist that have not been produced and, if no agreement can be reached with respect to those materials, file a motion identifying the specific materials in dispute and any legal authority supporting their disclosure.

9.     **Evidence subject to suppression.**  Mr. Watson seeks to compel "notice of the government's intention to use any evidence (in its case in chief at trial) which the defendant may be entitled to suppress" under any provision of the Federal Rules of Criminal Procedure or the United States Constitution.

[ECF 31-1, p. 9].  Once again, what Mr. Watson seeks amounts to an order directing the government to comply with its disclosure obligations under the law, without suggestion of actual noncompliance.  Accordingly, the request is denied as premature and unnecessary at this time.  This denial is without prejudice.  Mr. Watson should confer with the government to confirm that all such materials have been produced.  If there are any disputes about specific materials, Mr. Watson may raise those issues in another motion.

10. **Reports of examinations and tests.**  Mr. Watson seeks to compel production of any reports of relevant scientific or medical examinations and tests known to the government.  [ECF 31-1, p. 10].  In particular, Mr. Watson seeks any ballistics reports conducted on the firearms allegedly possessed by Mr. Watson and any tests performed on the silencers.  This request is denied as premature, given the government's acknowledgement that it is aware of its disclosure requirements and the lack of any evidence of noncompliance.  This denial is without prejudice.  Mr. Watson should confer with the government to determine whether any such tests or examinations exist that have not been produced and, if so, whether/when the government is obligated to disclose them.  If there are any disputes about specific materials, Mr. Watson may raise those issues in another motion.

11. **Electronic surveillance.** Mr. Watson seeks disclosure of various information related to any Title III wiretap interceptions collected during the investigation of this case.  [ECF 31-1, pp. 10-11].  This request is denied as premature, given the government's acknowledgement that it is aware of its disclosure obligations and given the lack of any evidence of noncompliance.  This denial is without prejudice.   Mr. Watson should confer with the government to determine whether any such information exists and, if so, whether/when the government is obligated to disclose it.  To the extent there

are any disputes about specific materials, Mr. Watson may raise those issues in another motion.

**12.     Summary of expert testimony.**   Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), Mr. Watson seeks the names of any expert witnesses the government intends to utilize in its case-in-chief, along with a written summary of the expert's opinions and qualifications.  [ECF 31-1, p. 11]. This request is denied as premature, given the government's acknowledgement that it is aware of the relevant disclosure requirements and given the lack of any evidence of noncompliance.  This denial is without prejudice.  Mr. Watson should confer with the government to determine whether any such information exists and, if so, whether/when the government is obligated to disclose it.  To the extent there are any disputes about specific materials, Mr. Watson may raise those issues in another motion.

**13.     *Brady* materials.**  Mr. Watson seeks to compel production of any information that the government is required to produce under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  [ECF 31-1, pp. 11-13].  The government responds that it is not aware of any undisclosed *Brady* material, and that it is fully aware of its obligation to provide any such information to Mr. Watson for his use at trial.  This request is therefore denied as premature, given the government's acknowledgement that it is aware of the relevant disclosure requirements and given the lack of any evidence of noncompliance. This denial is without prejudice.   Mr. Watson should confer with the government to determine whether any such information exists.  To the extent there are any disputes about specific materials, Mr. Watson may raise those issues in another motion.  Additionally, the Court's pretrial order will set a final deadline for the disclosure of any *Brady* materials known to the government.

14.    **Jencks Act materials.**    Finally, Mr. Watson seeks to compel production of any information that the government is required to produce under the Jencks Act, 18 U.S.C. § 3500.   [ECF 31-1, pp. 13-15].   Materials covered by the Jencks Act need not be produced until after a witness has testified on direct examination.   *See* 18 U.S.C. § 3500(a).   No witness has testified in this case, so Mr. Watson's request is denied as premature.   This denial is without prejudice for Mr. Watson to raise this issue, if necessary, at an appropriate time.

## <u>CONCLUSION</u>

For all the reasons discussed above, the Court denies Mr. Watson's motion to suppress evidence and motion to compel discovery.   An appropriate order follows.

DATED: December 3, 2020                    BY THE COURT:

                                          */s/ J. Nicholas Ranjan*
                                          United States District Judge